Lucille Fuller v. Commissioner. Estate of Charles Willis, Deceased, Mrs. Lucille Fuller, Executrix v. Commissioner. Lucille Fuller v. Commissioner.
Fuller v. Comm'r
Docket Nos. 63781, 84957, 84958.
United States Tax Court
T.C. Memo 1961-262; 1961 Tax Ct. Memo LEXIS 87; 20 T.C.M. (CCH) 1368; T.C.M. (RIA) 61262; September 18, 1961
John K. Lynch, Esq., 907 E. Ohio Bldg., Cleveland, Ohio, and Thomas F. Callahan, Esq., for the petitioners. William O. Allen, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: These consolidated cases now involve determinations of deficiencies in income tax, and additions to tax for fraud and for failure to file declarations of estimated tax against the estate of Charles Willis, deceased, hereinafter called decedent, for the years *88 1949 through 1955, in Docket No. 84957, as follows: Sec. 293(b),
I.R.C. 1939
Sec. 294(d)
Sec. 6653(b),
Sec. 6654(a),
(1)(A),
Year
Tax
I.R.C. 1954
I.R.C. 1954
I.R.C. 1939
1949
$1,182.44
$ 732.04
$119.99
1950
1,304.33
704.37
124.63
1951
1,671.09
835.55
140.22
1952
2,523.28
1,128.44
212.51
1953
3,186.27
1,659.94
293.72
1954
5,038.50
2,519.25
470.01
1955
979.60
$38.94 Respondent has determined similar deficiencies contested in Docket Nos. 63781 and 84958 against Lucille Fuller as transferee. The issues are: (1) whether respondent correctly determined decedent's income by specific adjustments and a net worth computation; (2) whether any part of any deficiency is due to fraud with intent to evade tax; (3) whether decedent's estate is liable for additions to tax under section 294(d)(1)(A); (4) whether petitioner Lucille Fuller is liable as transferee of the decedent's assets; (5) whether the statute of limitations bars the deficiencies for 1949 through 1954 and, if so, (6) whether 1954 is nevertheless still open under the extended statute of section 6501(e)(1)(A). Findings of Fact The stipulated *89 facts are hereby found accordingly. Docket Nos. 63781 and 84958 are transferee proceedings in which the petitioner is Lucille Fuller, the sister of decedent and hereinafter called petitioner. The petitioner in Docket No. 84957 is decedent's estate. Decedent timely filed his Federal income tax returns for the years 1949 through 1954 with the collector or district director of internal revenue at Cleveland, Ohio. His return for the year 1955 was timely filed by his executrix with the district director of internal revenue, Cleveland, Ohio. For the years 1949, 1952, and 1953 decedent filed amended returns with the collector or district director at Cleveland. Gross income reported in these returns was as follows: GROSS INCOME REPORTED
Year
Salary
Rent
Dividends
Pension
Total
1949
$3,062.42
$3,062.42
1950
3,129.00
$ 215.89
3,344.89
1951
3,423.55
3,423.55
1952
3,485.92
3,485.92
1953
3,910.23
3,910.23
1954
4,104.92
4,104.92
1955
2,320.17
$1,060.00
$ 500.00
3,880.17
Decedent was born in Dayton, Ohio, on or about February 4, 1889. He sometimes used the name Charles Sanford. He served in the *90 Army in World War I. After his discharge from the Army, he went to Youngstown, Ohio, where he worked at various jobs, including a job at Youngstown Sheet and Tube Company, where decedent hurt his arm. Commencing May 2, 1930, he received a monthly pension from the United States Veterans' Administration, payments from May 2, 1930, to February 28, 1956, amounting to $4,268.01. On December 1, 1934, decedent was appointed to the Youngstown, Ohio, Police Department and served continuously as a patrolman until his retirement in July 1955. During this period decedent's total salary was $51,982.73. Upon retirement decedent received a pension of $100 per month from the city of Youngstown. These payments terminated on his death. Decedent had the reputation in the Police Department of being of average intelligence and was considered a hard-working policeman. Where he had a personal interest in any official capacity he was considered neither trustworthy nor efficient. His superiors received numerous reports of his "rolling" - that is, robbing - drunks, although he was never criminally charged with the offense, and in April 1954, he was suspended for 15 days for releasing a prisoner without *91 authorization. At one time decedent had a restaurant and soft drink place in Youngstown, Ohio. After operating the restaurant for a couple of years, decedent sold the business in 1940 or 1941. During the period 1947 to 1954 decedent was a foot patrolman. After working hours he operated gambling games in two Youngstown gambling clubs, the 40 Athletic Club and the First Ward Athletic Club. He acted as the man who handled the money, known as a "stickman", and called the points at the dice tables. In addition, decedent frequently lent money to various people for short periods at interest as high as 60 percent over the term of the loan. The loans varied from $5 to $100 and would always be secured by articles of jewelry or personal property. Decedent kept a record of these loans in a 3inch X 5inch notebook. Because of the security for the loans, decedent rarely suffered any losses. However, he did incur losses in gambling. On or about November 26, 1928, decedent executed a mortgage on his residence located at 1011 Garland Avenue, Youngstown, Ohio, to Ruth A. McCracken for $800, payable in 2 years, with interest at 7 percent per annum. The mortgage contained an acceleration clause, *92 whereby the entire principal would become due and payable upon failure of the mortgagor to make payments of interest. On November 4, 1929, the mortgagee instituted foreclosure action against decedent, alleging that the interest payments had not been made when due. On May 7, 1930, the suit was voluntarily dismissed. Decedent was married on February 27, 1932. On January 12, 1934, decedent and his wife, Virginia, executed a mortgage on the Garland Avenue property to the Home Owners' Loan Corporation to secure a loan of $905.69. Payments were to be made on the loan at the rate of $3.77 per month until June 1936, and at the rate of $10 per month thereafter until the loan was paid. On May 20, 1937, decedent's wife purchased, under a land contract, property located at 921-923 McGuffey Road, Youngstown, Ohio. The purchase price of the property was $1,100, which decedent's wife agreed to pay at the rate of $15 per month, with 6 percent interest. Decedent's wife died in April 1952. The sole asset contained in her estate was the property located at 921-923 McGuffey Road, Youngstown, which property was still subject to the land contract of May 20, 1937. On August 5, 1952, decedent paid *93 the remaining balance due under the contract, amounting to $325.43, and the title to the property was conveyed to him. Thereafter decedent operated the McGuffey Road property as an apartment or tenement house. The property consisted of a two-story frame building, having originally been built as a store, with a house attached in the rear. The building was in one of the poorest sections of Youngstown and was in a run-down condition. Decedent divided the building into a number of rooms by installing partitions. Several of the rooms had permanent tenants but some were rented to transients and were frequently vacant. He also made some minor repairs. During the winter of 1955 and the spring of 1956 William Heard collected the rents for decedent and his records indicate that the rent collections varied from $141 to $231 per month for September, October, November, and December of 1955. During the period April 1952, to December 1954, the expenses incurred for water, light, and gas at the McGuffey Road property were as follows: Water
Electricity
Gas
April 1952 to December 1952
$20.10
$33.78
[1] $121.08
1953
65.50
79.40
242.40
1954
41.19
86.12
266.14
*94 In 1952, 1953, and 1954, decedent realized not less than $1,000, $3,000, and $2,500, respectively, from rental income on the McGuffey Road property. Decedent was interested in the stock market and frequently bought and sold stock. As early as 1940 decedent had acquired stock and he was transacting business with a brokerage house in 1943. On October 1, 1945, decedent opened an account in the name of Charles Sanford with the stock brokerage firm of Butler, Wick & Co., Youngstown, Ohio. During the period 1949 to 1956 stock in this account was held by Butler, Wick & Co. for the account of Charles Sanford, with the exception of 400 shares of Aetna Standard Engineering Co. which was registered in the name of decedent. The dividends on this stock were paid directly to decedent. In summary, decedent's transactions with Butler, Wick & Co., involving the purchase and sale of stock during the period 1949 to 1956, were as follows: January 1, 1949-March 11, 1956
On Hand January 1, 1949
Purchases
Sales
Shares
Cost
Shares
Cost
Shares
Selling Price
1610
$6,313.63
1267
$8,485.10
1601
$20,554.66
*95 During the years 1949 to 1955, Butler, Wick & Co. regularly advised its customers of each sale of securities by means of a printed form which set forth the date of sale, the number of shares sold, the selling price of the stock, and the expenses of sale. During the period 1949 through 1955, Butler, Wick & Co. regularly advised its customers of dividends received and credited to the customer's account by means of a "Dividend Notice." The "Dividend Notice" set forth the name of the security, number of shares owned by the customer, rate of dividend, and total amount of the dividend. It also contained the following prominently printed legend: We are required by law to report this credit to the Treasury Department and advise it be included in your income tax return for the current year. From January 1, 1949, through December 31, 1955, dividends were paid on stock standing in the name of decedent or Charles Sanford in the following amounts: Year
Amount
1949
$652.50
1950
650.89
1951
804.95
1952
826.60
1953
886.05
1954
780.03
1955
7.60
During the period September 13, 1952, to October 19, 1955, decedent rented a safedeposit box, No. E-282, from the Mahoning *96 National Bank under the name "Charles Sanford." Decedent had access to this box 22 times. During the same period decedent would change small bills into $50 and $100 bills several times a month. Decedent made a practice of keeping large amounts of cash on hand. In 1953 he was observed with cash in a money belt while on vacation and after 1950 he kept a large roll of bills in a large mothball can. Also in 1953 decedent had as much as $49,000 in his safe-deposit box. Some time after 1944 decedent lived with Lola Thomas, purportedly as common-law husband and wife. Lola Thomas supported herself and her daughter, although at times decedent would help to support the daughter. The records of the district director of internal revenue, Cleveland, Ohio, indicate the following taxes due from decedent, as shown by his returns in the years 1939-1948: Year
Liability
1939
$ 27.21
1940
38.73
1941
104.00
1942
150.65
1943
62.79
1944
No record [1]
1945
No record [1]
1946
No record [1]
1947
No record [1]
1948
No record [1]
Payment of these liabilities was generally made in $5 to $15 installments. Respondent's agents made *97 an examination to determine what decedent's assets were on January 1, 1949. This examination included the Probate Court in Youngstown, the Mahoning County Recorder's Office, Treasurer's Office, Auditor's Office, and Police Department, Butler, Wick & Co., and various local banks. Decedent's returns for the years 1949 through 1954, inclusive, were prepared by Mary Ditman, a notary public, from information supplied by decedent. Mrs. Ditman customarily asked decedent whether he had received any other income in rents or any dividends or anything. Decedent advised Mrs. Ditman that he had no income from these sources. The single exception occurred with respect to the year 1950, for which decedent reported $215.89 of dividends. During the year 1950 decedent's 1949 return was subjected to audit by the respondent concerning exemptions and deductions for dependency. At one of the conferences held in conjunction with the audit, respondent's agent asked decedent whether he had realized income in addition to that reported in decedent's 1949 return, such as from police work at football games or dances. Decedent replied that he had not. During the year 1951 decedent's 1950 return was subjected *98 to audit by the respondent. During this audit decedent had at least two conferences with respondent's agent. Most of the discussion between decedent and the agent concerned deductions and exemptions claimed by decedent in his return. During the course of the audit of decedent's 1950 return, the agent pointed out that the rental income from 921-923 McGuffey Road was required to be reported as taxable income. Decedent told the agent that his wife, who owned the property, was filing a separate return for the year 1950. As a result of the audit of decedent's 1950 return, the examining agent disallowed some of the deductions and exemptions claimed by decedent. Decedent appealed the determination to the examining agent's superior and was successful in having the determination reversed in part. In these conferences with respondent's agents, decedent exhibited a good grasp of what consitutes income and what is required to prove deductions for income tax purposes. On October 19, 1955, decedent closed the safe-deposit box at the Mahoning National Bank. On the same day, he purchased from the Mahoning National Bank a draft in the amount of $60,000 on the Irving Trust Company of New York *99 City. Decedent paid cash for the draft payable to "Charles Sanford." On January 13, 1956, decedent opened a savings account, No. XX1513, at the Woodland - East 55th Street branch of the Cleveland Trust Company, Cleveland, Ohio, with a $60,000 deposit represented by the bank draft. On February 29, 1956, decedent closed Savings Account No. XX1513 and the Cleveland Trust Company issued a bank draft to decedent for $60,000. Decedent endorsed the latter bank draft to his sister, petitioner, who, on March 9, 1956, deposited it in her personal savings account, No. X9938, at the Woodland - East 55th Street branch of the Cleveland Trust Company, Cleveland, Ohio. Petitioner did not give any consideration for this draft. After an extended illness, decedent died on March 11, 1956. On March 27, 1956, decedent's last will and testament was offered for probate in the Probate Court, Cuyahoga County, Ohio. Petitioner was appointed executrix. In 1956 an inventory and appraisement was filed with the said Probate Court, reflecting the following assets owned by decedent at the time of his death: ASSET
Schedule C - Stocks, Bonds, and Securities
Value
1. 100 shares - Segal Lock & Hardware
2. 100 shares - Norwalk Tire & Rubber
3. 300 shares - Tucker Corp. "A"
4. 100 shares - Burma Mines
$ 50.00
5. 100 shares - Western Stock, Ltd
25.00
6. 500 shares - Kaiser Motors
1,812.50
7. 31 shares - Wilson & Company
492.13
8. 20 shares - Pan Israel Oil
45.00
9. 20 shares - Israel Medit Petroleum
40.00
Total
$ 2,464.63
Schedule E - Real Estate
Parcel 1
1011 N. Garland Avenue, Youngstown, Ohio (Appraised
$ 2,500.00
value)
Parcel 2
921-923 McGuffey, Youngstown, Ohio (Appraised
6,500.00
value)
Total
9,000.00
Total appraised value of estate
$11,464.63
*100 At the time of the hearing of this case, the probate proceedings in the estate of decedent were still pending. The district director of internal revenue, Cleveland, Ohio, has filed a claim in the probate proceedings for the deficiencies in income tax, additions to tax, and interest here in controversy. To date, no claims other than that of the district director have been filed in the probate proceedings. On May 18, 1956, a statutory notice of deficiency was issued to the executrix of the said estate, notifying her of a jeopardy assessment and of respondent's determination of a deficiency with respect to decedent for the year 1955 in the amount of $56,429.76. No petition was filed with the Tax Court with respect to this determination. On March 21, 1956, a jeopardy assessment for the year 1955 in the amount of $54,780.54 for income taxes and additions to tax was made against petitioner, as transferee of decedent, by the district director of internal revenue, Cleveland, Ohio. On May 18, 1956, a statutory notice of liability was issued to petitioner with respect to said jeopardy assessment. Petitioner filed one of the petitions herein with the Tax Court for a redetermination of her *101 liability, the case being docketed as Docket No. 63781. On May 25, 1956, the district director of internal revenue seized $54,780.54 from the bank account of petitioner, No. X9938, at the Woodland - East 55th Street branch of the Cleveland Trust Company. On June 14, 1956, the district director seized an additional $1,649.22 from the said bank account of petitioner. On January 8, 1960, respondent advised petitioner, decedent's estate, and petitioner as transferee of decedent's assets of the respondent's determination of decedent's tax liability for the years 1949 through 1954 consisting of the following income tax deficiencies and additions to tax: Sec. 294
Sec. 293(b) - I.R.C. 1939
(d)(1)(A)
Year
Tax
Sec. 6653(b) - I.R.C. 1954
I.R.C. 1939
1949
$ 1,182.44
$ 732.04
$ 119.99
1950
1,304.33
704.37
124.63
1951
1,671.09
835.55
140.22
1952
2,523.28
1,128.44
212.51
1953
3,186.27
1,659.94
293.72
1954
5,038.50
2,519.25
470.01
$14,905.91
$7,579.59
$1,361.08 Respondent determined these deficiencies based on the following omissions from the reported income of decedent in the years 1949 through 1954: Omissions from Income
Adjusted Gross
Capital
Other
Year
Income Reported
Dividends
Rents
Gains
Income
1949
$3,062.42
$652.50
$ 74.40
$4,640.07
1950
3,344.89
435.00
190.88
4,640.07
1951
3,423.55
804.95
4,640.07
1952
3,485.92
826.60
$1,153.30
376.34
4,640.07
1953
3,910.23
886.05
3,055.44
76.14
4,640.07
1954
4,104.92
730.03
2,987.79
9,811.92
4,640.07
*102 Respondent calculated the "other income" by the following analysis of the source of funds for the bank draft of $60,000: Cashier's check
$60,000.00
Less: Identified source of funds
Stock sold before 10/19/55 and on hand on 1/1/49
$12,046.66
Net gain of stocks purchased and sold during period
2,465.32
Veteran's pension - 5/20/30-10/19/55
4,198.96
Dividends received - 1/1/49-10/19/55
4,701.02
Net rental income
7,196.53
Total
$30,608.49
Add: Estimated savings from salary
1,840.41
Total cash accounted for
$32,448.90
Less: Application of funds (stock purchased)
2,609.35
29,839.55
Cash unaccounted for and to be allocated as other
$30,160.45
income
Allocation of $30,160.45
1949 2/13 of $30,160.45
$ 4,640.07
1950 2/13 of $30,160.45
4,640.07
1951 2/13 of $30,160.45
4,640.07
1952 2/13 of $30,160.45
4,640.07
1953 2/13 of $30,160.45
4,640.07
1954 2/13 of $30,160.45
4,640.07
1955 1/13 of $30,160.45
2,320.03
$30,160.45 In addition, respondent disallowed two exemptions claimed by decedent in his 1954 return and made technical adjustments for claimed medical deductions in 1949 and 1951 as a result of an increase in adjusted gross *103 income. On March 31, 1960, respondent filed a second amended answer in Docket No. 63781, asserting that a deficiency of only $979.60, plus an addition to tax under section 6654(a) of the 1954 Code of $38.94, was due and owing from decedent's estate for the year 1955 and that the said deficiency, plus interest thereon, was due and owing from petitioner, transferee. Part of the deficiency in income tax for each of the years 1949 through 1954 is due to fraud with intent to evade tax. Decedent's returns for each of the years 1949 through 1954 were false and fraudulent with intent to evade tax. Decedent without reasonable cause failed to file declarations of estimated tax for each of the years 1949 through 1955. As a result of the transfer of $60,000 to petitioner, decedent became insolvent and, except to the extent above noted, without assets with which to satisfy the outstanding tax liabilities. Petitioner is a transferee of the property of decedent and, as such, is liable for any uncollected deficiency in decedent's tax to the extent of the value of the property received. Opinion The bar of the statute of limitations otherwise applying to the years 1949 through 1954 will *104 not be available to petitioners if decedent filed false or fraudulent returns for those years with intent to evade tax. While the burden of proof in this respect rests upon respondent and the evidence of fraud must be clear and convincing, it is seldom possible to establish a fraudulent intent by direct proof. . Repeated and substantial omissions or understatements of income evidence a fraudulent intent, (C.A. 9, 1958), affirming on this issue , particularly where no tenable excuse is offered. See . Significant and possibly illicit sources of income are suggested by respondent, together with persuasive evidence of an increase in decedent's net worth. See ; . But it is not necessary to rely on this evidence to conclude that for each of the years in controversy decedent filed false and fraudulent returns with intent to evade tax, and that some part of the deficiency is due to fraud. For each *105 of the years 1949 through 1954, decedent had income from dividends. In each of those years, except 1951, he had capital gains. And, in addition, from 1952 through 1954, he received rental income. None of these items, with a small partial exception in one year, was ever reported. The dividends and capital gain were received in the first instance through decedent's brokerage account, but he made somewhat corresponding and nearly simultaneous withdrawals, was advised by his brokers of the necessity of reporting dividend income, and must have known, at least from conversation both with the revenue agents and with the notary who prepared his returns, that this income was required to be included in his gross income. While it is true that these amounts were not enormous, and in the case of the rents were undoubtedly diminished to some extent by operating expenses, their omission was both systematic and, by comparison with the amounts actually reported, of undoubted significance. [3] The regular, unexplained and material failure to report items of income must be regarded as evidence of a fraudulent intent. (C.A. 3, 1959) affirming , *106 certiorari denied . It might at first glance be assumed that the notice received by decedent from his brokers, advising him that the dividend information was being forwarded to the respondent, could be regarded as an excuse for his failure to report them himself. Since the Treasury already knew of the income and in several instances audited his returns without referring to specific dividends, how could it evidence fraud if he continued to ignore the brokers' warning that dividends should be included in gross income? But this whole approach lacks merit when we recognize that these dividends appeared to belong *107 to Charles Sanford and were not carried in decedent's true name. The foregoing omissions fail, as we have said, to include other and possibly much larger receipts, which the record tends to show. Decedent was known to loan money at high interest rates, to engage in gambling, or at least outside employment, and possibly to have undertaken even less respectable forms of collecting cash. But they are not relied upon as any foundation for our factual conclusion as to the existence of a fraudulent intent with respect to the filing of decedent's income tax returns, and, except as they may justify respondent's determination as reasonable, and account for the size of the deficiencies, would be irrelevant. Once the issue of the statute of limitations has been eliminated, the burden of proving error in the deficiency, and particularly in its amount, rests upon petitioners. No convincing evidence as to error in any specific item has been produced. As to the year 1955, for which the burden is entirely upon decedent's estate, the deficiency must also be sustained as determined. For similar reasons the deficiencies in additions to tax for failure to file declarations of estimated tax under *108 section 294(d)(1)(A) must be approved, if the issue has not, in fact, been abandoned. Given the premises that decedent had anticipated gross income in excess of $600 and that no declarations were filed, the addition is mandatory in the absence of reasonable cause. , affd. (C.A. 6, 1959). And petitioner had the burden of proof as to both aspects, neither phase of which was borne. The final issue is the liability of petitioner Lucille Fuller as transferee. Notwithstanding that the burden of proof rests upon respondent, we are satisfied from the record that after decedent's transfer to petitioner, even considering only his indebtedness for taxes and additions to tax, decedent's liabilities exceeded his assets, and that the transfer rendered him insolvent, and we have so found. The transferee liability of petitioner Lucille Fuller necessarily follows even though at the time of the transfer decedent's tax liabilities had not been accurately determined. , and even regardless of the possibility that there may have been no affirmative intention to defraud *109 decedent's creditors, ; . The extent of transferee liability will depend, of course, upon respondent's success in collecting from the primary obligor, decedent's estate, , as respondent himself concedes.[4]
The foregoing dispositions require that Decision will be entered for the respondent in Docket No. 84957. Decisions will be entered under Rule 50 in Docket Nos. 63781 and 84958. Footnotes
1. The expense for gas in 1952 covers only the period May through December.↩
1. Withholding tax is not included.↩
3. ↩
Omitted
Income as
Omissions from Income
Percentage
of Reported
Reported
Capital
Income
n1 Year
Income
Dividends
Rents
Gains
Total
(Approximate)
1949
$3,062.42
$652.50
$ 74.40
$ 726.90
24
1950
3,344.89
435.00
190.88
625.88
19
1951
3,423.55
804.95
804.95
24
1952
3,485.92
826.60
$1,000.00
376.34
2,202.94
63
1953
3,910.23
886.05
3,000.00
76.14
3,962.19
101
1954
4,104.92
730.03
2,500.00
9,811.92
13,041.95
317
4. "* * * The respondent has filed a claim in the probate proceedings for the deficiencies in tax, penalty and interest here in controversy. The probate proceedings are still pending. If and when respondent realizes any funds on its claim in probate, the transferee liability of Lucille Fuller will be reduced pro tanto." (Resp. brief.)↩